David T. Wissbroecker (SB #342413)
**GRANT & EISENHOFER P.A.**
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel: 415-229-9720
dwissbroecker@gelaw.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| SEIU Pension Plan Master Trust, derivatively on behalf of ADOBE INC., <br><br> Plaintiff, <br><br> v. <br><br> SHANTANU NARAYEN, CHRISTIANO AMON, AMY BANSE, MELANIE BOULDEN, FRANK CALDERONI, LAURA DESMOND, SPENCER NEUMANN, KATHLEEN OBERG, DHEERAJ PANDEY, DAVID RICKS, DANIEL ROSENSWEIG, DANIEL DURN, ANIL CHARKRAVARTHY, and DAVID WADHWANI, <br><br> Defendants, <br><br> and <br><br> ADOBE INC., <br><br> Nominal Defendant. | No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff SEIU Pension Plan Master Trust ("Plaintiff"), derivatively on behalf of Adobe Inc. ("Adobe" or the "Company") alleges the following based on personal knowledge as to Plaintiff and Plaintiff's acts and as to all other matters on information and belief based on the investigation of Plaintiff's counsel, which included, among other things, a review of legal and regulatory filings, press releases, Adobe's online documents, media reports about Adobe and other public statements issued by the Company.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of Adobe against certain of its officers and directors for adopting and implementing an unlawful business strategy whereby Adobe used copyrighted material to develop its Artificial Intelligence ("AI") services.

2.      Adobe is a computer software company that offers programs including web design, PDF viewers, photo and audio/video editing, and AI services.  The AI services include Adobe's SlimLM series of small language model ("SLM") software optimized for document assistance tasks on mobile devices.  Unlike a large language model ("LLM") that requires large amounts of data storage, SLMs are designed to run on devices with limited hardware resources, such as smartphones, tablets, and laptops. SlimLM, as a language model, is trained by ingesting datasets that are chosen by Adobe personnel.

3.      Developing AI tools necessitates the collection and use of millions of lines of text, which must be procured by Adobe through lawful means and cannot contain copyrighted material for which Adobe's use is not permitted.

4.      SlimLM, according to Adobe's research, is pretrained on a dataset known as SlimPajama-627B ("SlimPajama").  SlimPajama is a copied, cleaned, and deduplicated version of the RedPajama dataset, which contains the "Books3" dataset.  The Books3 dataset contains hundreds of thousands of copyrighted books that were pirated without the authorization or consent of the authors.  The SlimPajama dataset also contains content from the Common Crawl dataset, which is also known to contain copyrighted and unauthorized materials.

5.      Defendants are all directors and/or officers of Adobe and knew of the copyright violations being perpetrated through Adobe's SlimLM AI platform.  Rather than utilize a clean dataset

- 1 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

that did not include copyrighted works, Defendants followed the "ask forgiveness not approval" model and adopted and implemented an unlawful plan to use a pirated dataset to develop the Company's AI services. Defendants' misconduct constitutes bad faith and a violation of positive law in directing, approving, or permitting the misconduct.

6. Defendants' misconduct has resulted in multiple copyright holders filing lawsuits against Adobe based on Abode's failure to compensate them for downloading, copying, storing, or using their copyrighted works, for which Adobe is now facing potential massive liability.

7. Defendants were well aware of all of these issues with Adobe's downloading, copying, and storing, and using the copyright holders' copyrighted works without their permission or compensation.

8. Defendants were also well aware of the potential liability for Adobe's unauthorized utilization of copyrighted based on multiple individual and class action lawsuits against other corporations for copyright infringements relating to AI platforms, including: (i) *Kadrey v. Meta Platforms, Inc*, No. 3:23-cv-3417-VC (N.D. Cal. 2023); (ii) *Concord Music Group Inc. v. Anthropic PBC*, No. 5:24-cv-03811-EKL (N.D. Cal. 2024) ("*Concord I*"); (iii) *Bartz v. Anthropic PBC*, No. 3:24-cv-05417-WHA (N.D. Cal. 2024); (iv) *In re Mosaic LLM Litigation*, No. 3:24-cv-01451-CRB (N.D. Cal. 2024); (v) *James v. Snowflake Inc.*, No. 2:25-cv-00108-BMM (D. Mont. 2025); (vi) *Hendrix v. Apple Inc.*, No. 3:25-cv-07558-YGR (N.D. Cal. 2025); and (vii) *Tanzer v. Salesforce Inc.*, No. 3:25-cv-08862-CRB (N.D. Cal. 2025).

9. Indeed, another AI development company, Anthropic, paid damages of $1.5 billion to resolve the *Concord I* action, and is now subject to additional damages of up to $3 billion in a second action filed in 2026, *Concord Music Group Inc. v. Anthropic PBC*, No. 3:26-cv-00880-RFL (N.D. Cal. 2026) ("*Concord II*"). This tidal wave of litigation filed against AI developers like Adobe served as blazing red flags alerting Defendants of the need to prevent Adobe from committing and continuing to commit the same unlawful conduct.

10. Copyright holders filed their initial class action against Adobe for copyright infringement on December 16, 2025, *Lyon v. Adobe, Inc.*, No. 3:25-cv-10732-JSC (N.D. Cal.), and their second class action against Adobe on February 9, 2026, *Kleiner v. Adobe, Inc.*, No. 3:26-cv-01218-JSC (N.D. Cal.).

- 2 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

As the date after the initial filing, Adobe's stock closed at $354.66 per share. As of the date after the second filing, Adobe's stock had dropped to a closing price of $264.67 per share, price drop of more than 25%. Thus, Defendants were, and are, well aware of the fraudulent and bad faith misconduct that has resulted in the copyright infringement class action filings, the potential damages Adobe may have to pay, and the resulting decline in Adobe's stock price and overall financial value.

11. As a result of all of this misconduct and violations, Adobe's Chief Executive Officer ("CEO") and Chairman of the Board, Shantanu Narayen ("Narayen"), unexpectedly stepped down from his CEO position on March 12, 2026. Narayen's departure was specifically linked to Adobe's failed AI strategy.

12. Adobe is now saddled with having to defend itself in two copyright infringement cases as a result of Defendants' misconduct and is facing potentially massive liability and related costs and reputational damages, as well as potential loss of customers and/or claims from Adobe customers who unwittingly used the copyright-infringing Adobe services.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because of claims arising under 15 U.S.C. §§ 78j(b) and 78n(a), and SEC regulations 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.10b-5 and 240.14a-9. This Court has supplemental jurisdiction pursuant to 28 U.S. C. § 1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.

14. This Court retains general jurisdiction over each named defendant who is a resident in this District. Additionally, this Court has specific jurisdiction over each named nonresident Defendant because each of the Defendants maintain sufficient minimum contacts in this District to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. At the time of the alleged wrongdoing detailed herein, Adobe was headquartered in this District, each of the Defendants was a director and/or officer of Adobe, and Defendants' conduct was purposefully directed at this District. Exercising jurisdiction over any nonresident Defendant is also reasonable under the circumstances.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa. Adobe is headquartered in this District, one or more of the Defendants either resides in or works in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Adobe occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

16. Plaintiff SEIU Pension Plan Master Trust is a current stockholder of Adobe and has continuously owned shares of Adobe common stock at all times relevant herein.

17. Nominal defendant Adobe is a Delaware corporation headquartered in San Jose. Adobe common stock trades on the Nasdaq under the ticker symbol "ADBE."

18. Defendant Narayen is Chairman of Adobe's board of directors (the "Board") and was CEO from December 2007 to March 12, 2026. Narayen received roughly $51.2 million in compensation for 2025, $52.4 million in compensation for 2024, $44.9 million for 2023, and $31.6 million for 2022, all approved by his co-defendants on the Board. Narayen stepped down from his role as CEO on March 12, 2026.

19. Defendant Christiano Amon ("Amon") has been a director since 2023. Amon is the President and CEO at Qualcomm Incorporated. Amon received over $389,919 in Board-related compensation for 2025.

20. Defendant Amy Banse ("Banse") has been a director since 2012. Banse is a partner at Mosaic General Partnership, and previously held several executive roles at Comcast Corporation and Comcast Interactive Media. Banse received over $419,919 in Board-related compensation for 2025.

21. Defendant Melania Boulden ("Boulden") has been a director since 2020. Boulden is the Executive Vice President and Chief Growth Officer to Tyson Foods, Inc., and previously held several executive and management roles at The Coca-Cola Company, Reebok International Ltd., Crayola LLC, Kraft Foods Group Inc., and Henkel Consumer Goods. Boulden received $389,919 in Board-related compensation for 2025.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

22.     Defendant Frank Calderoni ("Calderoni") has been a director since 2012.  Calderoni is the CEO of Velocity Global, and previously served executive roles at Anaplan Inc., Cisco Systems, Inc., and SanDisk Corporation.  Calderoni received $459,919 in Board-related compensation for 2025.

23.     Defendant Laura Desmond ("Desmond") has been a director since 2012 and is member of the Audit Committee.  Desmond is the CEO of Smartly.io, the CEO of Eagle Vista Partners, and the Operating Partner in the Media and Technology Practice at Providence Equity Partners LLC.  Desmond was previously the CEO of Starcom MediaVest Group.  Desmond received $392,955 in Board-related compensation for 2025.

24.     Defendant Spencer Neumann ("Neumann") has been a director since 2022 and is a member of the Audit Committee.  Neumann is the CFO of Netflix, and previously served as the CFO of Activation Blizzard and the Walt Disney Company.  Neumann received $394,919 in Board-related compensation for 2025.

25.     Defendant Kathleen Oberg ("Oberg") has been a director since 2019 and is a member of the Audit Committee.  Oberg is the CFO of Marriott International.  Oberg received $429,919 in Board-related compensation for 2025.

26.     Defendant Dheeraj Pandey ("Pandey") has been a director since 2019 and is a member of the Audit Committee.  Pandey is the Chair and CEO at DevRev, a software-as-a-service company focused on AI and design to automate software and customer engineering workflows.  Pandey previously founded Nutanix, Inc., and served as VP (and Director) of Engineering at Aster Data Systems, Inc.  Pandey received $394,919 in Board-related compensation for 2025.

27.     Defendant David Ricks ("Ricks") has been a director since 2018.  Ricks is the President and CEO of Eli Lilly.  Ricks received $389,919 in Board-related compensation for 2025.

28.     Defendant Daniel Rosensweig ("Rosensweig") has been a director since 2009.  Rosensweig is the Executive Chair of Chegg, Inc.  Rosensweig previously served as the President and CEO of RedOctane, an Operating Principal at the Quadrangle Group LLC, the COO of Yahoo!, the President of CNET Networks, and several executive roles at Ziff-Davis and ZDNet.  Rosensweig received $384,919 in Board-related compensation for 2025.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

29. Defendant Daniel Durn ("Durn") is Adobe's CFO and Executive Vice President, Finance, Technology, Security and Operations. Durn drove Adobe's internal generative AI learning and adoption through the AI@Adobe program, and also drove Digital Media and Digital Experience growth. Durn received roughly $16.3 million in 2025 compensation, $15.6 million in 2024 compensation, $14.3 million in 2023 compensation, and $13.2 million in 2022 compensation, all approved by the Board.

30. Defendant Anil Chakravarthy ("Chakravarthy") is the President, Digital Experience Business. Chakrvathy launched generative AI strategy for Abode Experience Cloud and generative AI-first new applications such as Adobe GenStudio for Performance Marketing and AEP AI Assistant. Chakrvathy received nearly $17.8 million in 2025 compensation, $17 million in 2024 compensation, $15 million for 2023 compensation, and $10 million for 2022 compensation, all approved by the Board.

31. Defendant David Wadhwani ("Wadhwani") is the President, Digital Media Business. Wadhwani delivered Firefly innovations in imaging vector, video (in beta) and design, integrated into products and workflows, and launched Firefly Custom Models, Express on Mobile and Acrobat AI assistant. Wadhwani received nearly $17.8 million in 2025 compensation, $17 million in 2024 compensation, $16.7 million for 2023 compensation, and $11.6 million for 2022 compensation, all approved by the Board.

32. Defendants Amon, Bonse, Boulden, Calderoni, Desmond, Narayen, Neumann, Oberg, Pandey, Ricks, and Rosensweig are collectively referred to herein as the "Director Defendants." Defendants Oberg, Desmond, Neumann, and Pandey are collectively referred to herein as the "Audit Committee Defendants." Defendants Narayen, Durn, Chakrvathy, and Wadhwanu, are collectively referred to herein as the "Officer Defendants." The Director Defendants and the Officer Defendants are collectively referred to herein as the "Defendants."

## DUTIES OF THE DEFENDANTS

### A. General Fiduciary Duties of Officers and Directors

33. By reason of their positions as officers and directors of the Company, each of the Defendants owed and owe Adobe and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Adobe in a fair, just, honest, and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

equitable manner.  Defendants were and are required to act in furtherance of the best interests of Adobe and not in furtherance of their personal interest or benefit.

34.    Each Defendant owes to Adobe and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

35.    Defendants, because of their positions of control and authority as directors and/or officers of Adobe, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36.    Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Adobe, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.    As senior officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act (the "Exchange Act") and traded on the Nasdaq, the Defendants also had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, operations, products, management, and internal controls, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

38.    To discharge their duties, the officers and directors of Adobe were required to exercise reasonable and prudent supervision (in like position) over the management, policies, practices, and controls of the financial affairs of the Company

39.    At all times relevant hereto, the Defendants were the agents of each other and of Adobe and were at all times acting within the course and scope of such agency.

40.    Because of their advisory, executive, managerial, and directorial positions with Adobe, each of the Defendants had access to adverse, non-public information about the Company.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

41. Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statement issued by Adobe.

**B.   Adobe's Code of Ethics and Code of Business Conduct**

42. In addition to the fiduciary obligations owed to Adobe, each of the Defendants were also subject to layers of Adobe policies prohibiting certain conduct.

43. The Officer Defendants, as senior officers of Adobe, are bound by the Company's Code of Ethics. The Code of Ethics sets out basic principles to guide all senior officers of Adobe are required to perform their duties in an honest and ethical manner, and to handle all actual or apparent conflicts of interest between personal and professional relationships in an ethical manner. In particular, the Code of Ethics provides:

(a) Each Senior Officer will comply with applicable governmental laws, rules, and regulations.

(b) Senior Officers must promptly bring any instance, occurrence, or practice that they, in good faith, believe is inconsistent with or in violation of this Code of Ethics to the attention of the Chief Compliance Officer or the General Counsel or, if such person is involved in the matter giving rise to the conflict, Adobe's Audit Committee.

(c) Senior Officers should use common sense and good judgment and act in good faith. Senior Officers who become aware of a suspected violation should not attempt to investigate it or resolve it on their own. Prompt disclosure to the appropriate parties is vital to ensuring a thorough and timely investigation and resolution. A violation of this Code of Ethics is a serious matter and could have certain legal implications. Reports of suspected violations should always be made in good faith.

44. All Defendants are also subject to the Company's Code of Business Conduct, which purports to establish the principles of business conduct that Adobe considers fundamental in its

- 8 -

operations worldwide.  In particular, the Code of Business Conduct provides that each officer, director and employee must:

(a)    Report suspected violations with an honest, good-faith belief, either through external channels, or report possible violations of law or regulation to a governmental agency or entity.  Adobe will promptly investigate any reported violation or potential violations of its policies and take corrective action as needed.

(b)    Use Company resources only to perform legitimate business functions, and may not use Adobe's assets for any function that they are not authorized to perform, for any illegal purposes, or any matter that violates the Code of Business Conduct, and avoid any unauthorized use, alteration, destruction, distribution, theft, waste or other carelessness when handling Adobe's assets.

(c)    Confirm that Adobe has the appropriate rights before using, making copies of, transferring (externally or internally), or reselling any copyrighted materials, including any third-party software, manuals, articles, books, and databases, and ensure that any third-party software used is properly licensed and only used in accordance with the licensing agreement and relevant Adobe policies.

(d)    Commit to advancing AI in an ethical, responsible, and inclusive way, to ensure that Adobe's AI technologies respects Adobe's customers and aligns with Adobe's values.

**C.    Adobe's Audit Committee Charter**

45.    The Audit Committee Defendants are subject to heightened responsibilities to identify, assess, and mitigate risks associated with the Company's operations.

46.    Under the Audit Committee Charter, the Audit Committee Defendants owed specific additional duties to assist the Board in overseeing management's financial controls, the Company's enterprise risk management program and the Company's compliance with related legal, regulatory and ethical requirements.

- 9 -

47.   As stated in the Company's most recent Proxy Statement:

(a)   Our Audit Committee has primary responsibility for oversight of our ERM [enterprise risk management] program, as well as oversight of particular risks, such as cybersecurity, privacy, information and technology security and financial risk exposures and the steps our management has taken to monitor and control these exposures.  The Audit Committee monitors the effectiveness of our Code of Ethics for senior officers.  The Audit Committee also monitors compliance with legal and regulatory requirements and oversees the performance of our internal audit function and of our independent registered public accounting firm.  In carrying out this oversight, the Audit Committee receives or participates in:

- regular updates by the CCO, CSO and senior cyber legal and other professionals regarding key risks, including cybersecurity;
- annual compliance updates regarding key compliance issues, as well as ongoing updates on developing risks, from the CCO, who reports to the Chief Legal Officer and regularly interacts with and directly communicates with the Audit Committee;
- annual meetings with the CCO without management present regarding key risks, issues or concerns;
- quarterly meetings without management present with the CAE, who reports to the Audit Committee, regarding key risks, issues or concerns;
- annual reviews of the Company's key risks by the CAE, including mitigation strategies, identified in the ERM process; and
- quarterly reviews of the risk factors included in the Company's quarterly and annual reports filed with the SEC.

(b)   The Audit Committee's role includes assisting the Board in fulfilling its responsibilities related to the oversight of our financial, accounting and reporting processes; our system of internal accounting and financial controls; our technology security policies and internal cybersecurity and privacy controls; our

- 10 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

ERM program; and our compliance with related legal, regulatory and ethical requirements.  The Audit Committee's responsibilities include:

- the appointment, compensation, engagement, evaluation, retention, termination and oversight of our independent registered public accounting firm, including conducting an annual review of its independence;
- reviewing and approving the planned scope of our annual audit;
- overseeing our independent registered public accounting firm's audit work;
- reviewing and pre-approving any audit and non-audit services that may be performed by our independent registered public accounting firm;
- reviewing with management and our independent registered public accounting firm the adequacy of our internal financial and disclosure controls;
- reviewing our critical accounting policies and practices, critical audit matters and the application of accounting principles;
- reviewing and discussing with management the adequacy and effectiveness of our information and technology security policies and internal controls regarding information and technology security, cybersecurity and privacy related areas;
- monitoring the rotation of partners of our independent registered public accounting firm on our audit engagement team as required by regulation;
- reviewing our policies and practices with respect to swaps transactions;
- overseeing, and approving any amendments to, Adobe's worldwide investment policy;
- overseeing the performance of our internal audit function;
- establishing and reviewing our procedures, as required under applicable regulation, for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or auditing matters

- 11 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- overseeing and reviewing relevant elements of Adobe's ERM program; and
- reviewing and discussing with management and our independent registered public accounting firm our annual audited financial statements and quarterly financial statements.

(c)    The Audit Committee has the authority to obtain independent advice and assistance from internal or external legal, accounting and other advisors at Adobe's expenses.

**D.    Breaches of Duties**

48.    Defendants' conduct constitutes a knowing and culpable breach of their duties as officers and/or directors of Adobe, demonstrating a lack of good faith and a reckless disregard for their obligations to the Company, as their actions violated positive law and they either knew or were reckless in failing to recognize that their actions posed a significant risk of serious harm to the Company.

49.    Defendants breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to violate copyright laws, federal securities laws, and to cause, or by themselves causing, the Company to make improper statements to the public and failing to implement adequate internal controls over legal and regulatory compliance.  These improper practices caused Adobe to incur substantial damages.

50.    Defendants, because of their positions of control and authority as officers or directors of Adobe, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  Defendants also failed to prevent the other Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Adobe has expended, and will continue to expend, significant sums of money to remedy Defendants' failures.

**FACTUAL BACKGROUND**

**A.    The AI Process**

51.    Adobe has been actively working for a decade to build its AI innovation and to capitalize on the explosive growth of generative AI and digital content.

- 12 -

52. Adobe's SlimLM models are SLMs for on-device document assistance. Adobe has promoted SlimLM as a part of its AI offerings and as a model intended for integration into mobile devices.

53. SLMs are trained by ingesting large volumes of text, often millions or billions of lines. This construction is accomplished by acquiring and digitally copying works and storing those copies, oftentimes in multiple locations and formats, to support preprocessing, deduplication, tokenization, and training. SLMs are pre-trained by processing each textual work in the training dataset to learn statistical patterns and associations within it. The results of this learning process are encoded in a large set of numbers called parameters stored within the model, derived from the entire pre-training dataset.

54. Adobe's SlimLM is pre-trained on the SlimPajama dataset, which is assembled and published by Cerebras Systems Inc. ("Cerebras"), directly derived from Together Computer, Inc.'s ("TogetherAI") RedPajama dataset. Cerebras describes its SlimPajama dataset as a copied, cleaned, and deduplicated version of Together AI's RedPajama dataset.

55. The RedPajama dataset "is a publicly available, fully open, best-effort reproduction of the training data … used to train the first iteration of LLaMA family of models." This LLaMA training dataset included the Books3 section of "The Pile" (a broader, publicly available dataset which contained Books3).

56. In October 2020, the Books3 dataset, consisting of approximately 196,640 books sourced from the online pirate "shadow library" Bibliotek, was made available online to provide AI developers with access to high-quality data. The Books3 dataset included copyrighted books without permission, in violation of the Copyright Act.

57. The Pile that includes Books3 is a dataset articulated in a paper by EluetherAI called "The Pile: An 800GB Dataset of Diverse Text for Language Modeling," which described the Books3 as "a dataset of books derived from a copy of the contents of the Bibliotik private tracker … Bibliotik consists of a mix of fiction and nonfiction books and is almost an order of magnitude larger than our next largest book dataset (BookCorpus2). We included Bibliotik because books are invaluable for long-range context modeling research and coherent storytelling."

58. Bibliotek is well known as a notorious pirate website that contains vast quantities of unauthorized copyright materials used to train AI language models. Utilizing these illegal libraries

- 13 -

provided Adobe and other AI entities to access large quantities of training data rapidly. Such pirate libraries are in violation of the Copyright Act, and the AI developers use of such materials to train AI models is not shielded by the fair use doctrine.

59. The Books3 dataset, as confirmed by the person that assembled it, Shawn Presser, represents all of Bibliotek. And, downloading the Pile dataset from sources such as "The Eye" and the "Hugging Face" downloads a copy of Books3 and all of its unlicensed copyrighted material.

**B.    Adobe's SlimLM is Based on Pirated Library Copies in SlimPajama**

60. The SlimPajama dataset was created by copying and manipulating the RedPajama dataset (including copying Books3). In October 2023, the Books3 dataset was removed based on the fact that it "is defunct and no longer accessible due to reported copyright infringement." Book3s was included entirely with the RedPajama dataset, which is also available for downloading from the Hugging Face website. The Books3 dataset removal was messaged in RedPajama dataset documentation due to reported copyright infringement. Prior to October 2023, any person or entity that downloaded the RedPajama or The Pile datasets from Hugging Face was therefore downloading a copy of the Books3 dataset.

61. The SlimPajama dataset is also based in part on the Common Crawl dataset, which is known to create copyrighted materials, including articles published on news websites and in digital newspapers. Also in 2023, a Dutch non-profit entity asked the creators of Common Crawl to remove over "two million news articles belonging to popular Dutch news outlets from its AI training dataset," which were copied without permission.

62. Thus, the SlimPajama dataset contains copyrighted material that has not been licensed and authorized by its owners. Based on this, Adobe's SlimLM is trained on multiple datasets that contain copyrighted works that are not authorized or approved by authors and copyright holders.

63. Adobe Firefly generates Adobe's AI model. Adobe Firefly is Adobe's family of creative generative AI models that span image, video, vector, audio, and more. Defendants state that Adobe "introduced multiple generative AI models in Adobe Firefly, our family of creative generative models" and "[w]e are exposing the power of our creative tools and the magic of generative AI through Firefly Services APIs." Defendants tout the Adobe Firefly product on numerous places on Adobe's website, as an AI generator that was built through "thoughtful, responsible development," claiming that Abode

- 14 -

"developed Adobe Firefly to prevent it from creating content that infringes copyright or intellectual property rights, and it is designed to commercially safe," and Abode does "not mine content from the web to train Adobe Firefly."

64.    Even though Defendants contend that Adobe has ethical AI development for its Firefly product, these statements are inaccurate because they caused Adobe to develop its SlimLM SLM as part of its AI offerings via Firefly, and SlimLM was trained on multiple datasets of copyright materials. Adobe's website describing the SlimLM model did not discuss any potential compensation for the writers and creators of the work on which SlimLM was trained.

65.    The Adobe website also includes a publication prepared by Adobe research employees and university professors, entitled "SlimLM: An Efficient Small Language Model for On-Device Document Assistance." The publication was set up to present and describe the SlimLM process, which is a "series of SLMs optimized for document assistant tasks on mobile devices." The publication acknowledged, among things, that "We pre-trained SlimLM on the SlimPajama dataset":

*SlimLM is pre-trained on SlimPajama-627B* and fine-tuned on DocAssist, our constructed dataset for summarization, question answering and suggestion tasks. Our smallest model demonstrates efficient performance on S24, while larger variants offer enhanced capabilities within mobile constraints. We evaluate SlimLM against exising SLMs, showing comparable or superior performance and offering a benchmark for future research in on-device language models. We also provide a research demo, offering practical insights into SLM deployment. Our findings provide valuable insights and illuminate the capabilities of running advanced language models on high-end smartphones, potentially reducing server costs and enhancing privacy through on-device processing.

\*\*\*\*\*

We propose a set of small language models *pretrained on SlimPajama* with 627B tokens and finetuned on the DocAssist dataset.

\*\*\*\*\*

**Data Collection**

We utilize our proprietary tools to compile a diverse collection of documents, primarily consisting of illustrations, presentation slides, and spreadsheets. This dataset also includes machine-generated documents to ensure a comprehensive representation of various document types. We extract the document contents and prepare them for pre-processing to ensure the data is suitable for model fine-tuning.

\*\*\*\*\*

- 15 -

SlimLM is based on the MPT (Mosaic Pre-trained Transformer) architecture by MosaicML-NLP-Team, 2023 with specific modifications to optimize for document assistance tasks.

\*\*\*\*\*

Our largest model, SlimLM-1B, approaches the performance of the much larger model Qwen2-1.5B-Instruct, highlighting the potential for SlimLM to achieve competitive results with reduced computational requirements. While the commercial LLM still leads in overall performance, our SlimLM models offer a range of efficient options for various computational constraints and privacy concerns in document assistance tasks.

\*\*\*\*\*

**SLMs for Mobile Devices**

Deploying language models on mobile devices presents unique challenges, including memory constraints, inference latency, and energy efficiency (Liu et al., 2024; MBZUAI, 2024.02; Chen et al., 2024). The growing importance of efficient on-device language models is further underscored by recent developments from major tech companies (Reid et al., 2024; Apple, 2024.09; Meta, 2024.09). Our work extends this line of research by identifying the optimal balance between model size, context length, and performance specifically for real mobile devices e.g. Samsung Galaxy S24. We focus on enhancing document assistance abilities by *designing and training SlimLM (Sec. 2.3) from scratch on SlimPajama* and DocAssist (Sec. 2.2), advancing the SoTA in mobile-deployed language models for document processing applications.

\*\*\*\*\*

In this work, we introduce SlimLM models optimized for document assistance tasks. We identify the optimal balance between model size, inference time, and maximum context length for efficient processing on real mobile devices. Our specialized DocAssist dataset, constructed from~83K documents, enabled fine-tuning of SlimLM for three critical document assistance tasks. SlimLM models, ranging from 125M to 1B parameters, demonstrate comparable or superior performance to existing SLMs of similar sizes across standard metrics, while efficiently handling up to 800 context tokens. To showcase real-world applicability, we develop a research demo featuring SlimLM's document assistance capabilities, paving the way for widespread deployment of efficient, on-device language models for enhanced user privacy and reduced server costs. (Emphasis added.)

66.     Defendants directed and/or allowed Adobe to use the SlimPajama dataset to build Adobe's SlimLM. Defendants were in a rush to catch up on the AI revolution, and, rather than develop its own LLM or access a commercial LLM to train a slimmed-down SLM version for use on mobile devices, Defendants adopted and pursued the unlawful business plan to build SlimLM on the copyright-violating data contained in SlimPajama.

67.     Litigation by copyright holders inevitably ensued.

- 16 -

**C.    Red Flags of Adobe's Copyright Infringement**

68.    Defendants were well aware of the potential liability stemming from Adobe's unauthorized use of copyrighted works in developing SlimLM.

69.    First, all of the Officer Defendants were personally involved in the development of Adobe's AI strategy and the details of the SlimLM AI dataset Adobe chose as its SLM to develop the Company's AI products instead of other commercially available LLMs that did not include copyrighted material.

70.    Second, the multiple individual and class action lawsuits against other AI developers for copyright infringement put all Defendants on notice of the need to avoid using unlicensed copyrighted materials in the LLMs and SLMs used to train AI models.  Multiple class actions filed in 2025 prior to the copyright infringement lawsuits filed against Adobe involve claims against Adobe's competitors based on the exact same approach to Defendants' construction of an AI training database premised on RedPajama and Books3.

71.    The first action filed against Anthropic in 2023, *Concord I*, alleged that Anthropic "torrented 'countless pirated copies' of songbooks and sheet music."[1]  Anthropic "used BitTorrent to download publishers' works" and "simultaneously uploaded to the public large unauthorized copies of the same works, separately violating publishers' exclusive right of distribution and encouraging further infringement of their copyrighted works."[2]

72.    In the *Mosaic* action, copyright holders filed lawsuit against Nvidia and Databricks in 2024.  *See In re Mosaic LLM Litigation*, No. 3:24-cv-01451-CRB (N.D. Cal. 2024).  Those copyright holders allege damages from use of their works in a "Mosiac ML".  That dataset was used in developing the the MosaicML Pretrained Transformer, a type of artificial intelligence/LLM software.  Notably, Adobe acknowledges that "SlimLM is based on the MPT (Mosaic Pre-trained Transformer) architecture by MosaicML-NLP-Team, 2023"—*i.e., the same product that resulted in copyright claims against Nvidia and Databricks in 2024.*

---

[1] Law360, *Anthropic Hit With 2nd Music IP Suit, This Time for $3B*, available at: https://www.law360.com/articles/2435463/ (Jan. 28, 2026).

[2] *Id*.

- 17 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

73.    Copyright holders pursuing litigation against AI developers have focused in on the RedPajama dataset and its copyright-infringing data.

74.    Copyright holders filed a lawsuit against Snowflake in 2025, alleging that RedPajama is a training database that "'contained within it a deduplicated copy' of Books3… '[a] dataset described in [the Pile paper as] derived from a copy the contents of [] Bibliotek." *James v. Snowflake Inc.*, No. 2:25-cv-00108-BMM (D. Mont. 2025) (ECF No. 1 at 4).  Copyright holders there alleged that to "train [its] Artic [models], Snowflake downloaded, copied, stored, and used the RedPajama dataset [that] contain[ed] Books3… and repeatedly … processed [] works during preprocessing and pretraining, and retained copies … on its servers for further training." *Id*. at 6.

75.    Copyright holders also filed a lawsuit against Apple in 2025, for using unlicensed copyrighted works, including books from the RedPajama dataset. *Hendrix v. Apple Inc.*, No. 3:25-cv-07558-YGR (N.D. Cal. 2025).  The lawsuit alleges that Apple undertook an "unauthorized reproduction of a 'Book3' dataset, – which includes the Infringed Works - to train [] language models"; and the unauthorized use of datasets that included copyright works for training. *Id.* at ECF No. 1 at 13-14.  The authors state that Apple published a paper about the language model that revealed a large quantity of training data came from RedPajama. *Id.* at 6.

76.    Further, copyright holders filed an action against Salesforce in 2025 for improperly training its artificial intelligence models on copyrighted works, and relied on "notorious" datasets of pirated books to creates its AI models. *Tanzer v. Salesforce Inc.*, No. 3:25-cv-08862 (N.D. Cal. 2025) ECF No. 1 at 1.  Salesforce also used the same two datasets that Adobe used, the RedPajama and the Pile, which "contain hundreds of thousands of copyrighted books that were acquired without the authorization or consent of the authors." *Id*.

77.    Defendants knew or should have known of this vortex of litigation targeting AI developers, all of which was widely reported.  Defendants were also on notice of the widely reported resolution of the *Concord I* case, which Anthropic paid damages of $1.5 *billion* to resolve after Judge Alsup on June 23, 2025 issued a summary judgement Order on Fair Use establishing Anthropic's potential liability for the "Pirated Library Copies."  The Court "denie[d] summary judgment for Anthropic that the pirated library copies must be treated as training copies," and set up a "trial on the

- 18 -

pirated copies used to create Anthropic's central library and the resulting damages, actual or statutory (including for willfulness). *Concord I*, No. 3:24-cv-05417-WHA (N.D. Cal.) (ECF No. 231 at 31-32).

78.    All Defendants were well aware of that their unlawful business model involved Adobe's violation of copyright laws long before the actions were field against Adobe. As early as the October 2023 reported "removal" of the Books3 dataset "due to reported copyright infringement," Defendants knew that Adobe was utilizing pirated library copies and would be subject to billions of dollars of damages. These copyrighted materials were placed on the RedPajama or the Pile datasets, and both of these datasets still maintain the copyrighted materials downloaded from the Books3 dataset.

**D.    The Copyright Infringement Class Actions Against Adobe**

79.    Copyright holders filed their initial class action against Adobe for copyright infringement on December 16, 2025 (*Lyon*), and their second class action on February 9, 2026 (*Kleiner*). The actions allege that Adobe used pirated libraries that included copyrighted materials and that Adobe's downloading, storage, and use of the copyrighted works was not fair use. "Abode could have—but chose not to—lawfully obtain the Infringed Work." *Kleiner*, No. 3:26-cv-01218-JSC, ECF No. 1 at 10. *Kleiner* cited to *Bartz v. Anthropic PBC*, stating "[i]t is nearly impossible that 'any accused infringer could ever meet its burden of explaining why downloading source copies from pirate sites *that could have purchased or otherwise accessed lawfully* was itself reasonably necessary to any subsequent fair use." *Id.* (citing to *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1025 (N.D. Cal. 2025)).

80.    The *Lyon* class action alleged that the authors owned registered copyrights in certain books that were included in the SlimPajama dataset that was used by Adobe to train is SlimLM models, and that the authors never authorized Adobe to download, copy, store and/or use their copyright works as pre-training models. The authors assert that their registered copyrights were pirated, and they were infringed on.

- 19 -

81.     As described in the *TechCrunch* news report, "Adobe hit with proposed class-action, accused of misusing authors' work in AI training"[3]:

Like pretty much every other tech company in existence, Adobe has leaned heavily into AI over the past several years.  The software firm has launched a number of different AI services since 2023, including Firefly—its AI-powered media-generation suite.  Now, however, the company's full-throated embrace of the technology may have led to trouble, as a new lawsuit claims it used pirated books to train one of its AI models.

Lyon's lawsuit, which was originally reported on by Reuters, says that her writing was included in a processed subset of a manipulated dataset that was the basis of Adobe's program: "The SlimPajama dataset was created by copying and manipulating the RedPajama dataset (including copying Books3)," the lawsuit says.  "Thus, because it is a derivative copy of the RedPajama dataset, SlimPajama contains the Books3 dataset, including the copyrighted works of Plaintiff and the Class members."

"Books3"—a huge collection of 191,000 books that have been used to train GenAI systems —has been an ongoing source of legal trouble for the tech community.  RedPajama has also been cited in a number of litigation cases.  In September, a lawsuit against Apple claimed the company had used copyrighted material to train its Apple Intelligence model.  The litigation mentioned the dataset and accused the tech company of copying protected works "without consent and without credit or compensation."  In October, a similar lawsuit against Salesforce also claimed the company had used RedPajama for training purposes.

82.     A news article by cryptorank, *Explosive: Adobe Faces Massive Class-Action Lawsuit Over Alleged AI Training Data Theft[4]*, described Adobe's potential liability:

This case stands out for several reasons.  First, Adobe has positioned itself as a company that respects creator rights, making these allegations particularly damaging to its reputation.  Second, the lawsuit specifically targets the company's use of the Books3 dataset, which …. contains 191,000 books, potentially affecting thousands of authors.

*****

The Adobe case highlights a fundamental tension in the AI industry.  Companies need massive amounts of data to train effective models, but obtaining proper licensing for all that content is expensive and complex.  This has led some companies to use datasets like Books3 and RedPajama, which contains copyrighted material obtained through questionable means.

83.     After the *Lyon* action was filed, Defendants initially denied the allegations, "asserting that SlimLM was trained on SlimPajama-627B—an open-source datatset that was released by Cerebras in 2023.  However, the lawsuit claims that SlimPajama is derivative of RedPajama, which includes

---

[3]  https://techcrunch.com/2025/12/17/adobe-hit-with-proposed-class-action-accused-of-misusing-authors-work-in-ai-training/

[4]  https://cryptorank.io/news/feed/0080a-adobe-ai-lawsuit-training-data

- 20 -

Books3's set of nearly 200,000 pirated books.  In short, *Lyon* argues that because SlimPajama includes RedPajama/Books3, it contains copyrighted work without consent, credit, or compensation."[5]  On March 16, 2026, Adobe answered the *Lyon* complaint instead of moving to dismiss it.[6]

84.    The *Kleiner* action alleged that copyrighted works were infringed on a massive scale through Adobe's use of the SlimPajama dataset and the copyrighted works via RedPajama and Common Crawl.  The *Kleiner* action further alleged (ECF No. 1 at 10-11):

> Adobe used the SlimPajama dataset (comprised of data from the RedPajama and Common Crawl datasets), which includes materials sourced from shadow libraries known to indiscriminately hoover up countless copyrighted works, for its centralized commercial database, all with complete disregard to the rights of copyright holders. ***Adobe used these datasets containing Plaintiff's and Class members' copyrighted works as a substitute for purchasing or compensating creators for authorized copies of those works***.  In doing so, Adobe displaced or diluted the market for Plaintiffs' and Class members' works. Plaintiff's works were copied and maintained for future commercial purposes, including to further develop its SlimLM series of SLMs.  Pirating otherwise purchasable works is copyright infringement.
>
> The exploitation of Plaintiff's Infringed Work was not indirect.  It was and is a direct and illegal download, use and scraping of the entirety of Plaintiff's' Infringed Work (as part of the SlimPajama dataset) with no transformation of form.  Plaintiff's Infringed Work was copied, used and maintained for future commercial purposes.  Defendant's use was not transitory as Plaintiff's Infringed Work was not immediately destroyed, but was retained to train Adobe's SLMs.  Integration of this technology into Adobe's existing document editing and creation suite could generate billions of dollars for Adobe.  Adobe's "piracy of otherwise available copies is inherently, irredeemably infringing even if the pirated copies are immediately used for [a] transformative use and immediately discarded." *Id.* at 1025.
>
> Adobe's use of these copyrighted works to train its SlimLM SLMs are not transformative. SLM outputs are the result of statistical outputs based on the training corpora.  Broadly, SLMs operate by probabilistically predicting the next "token."  Tokens are units of language which can be words, combinations of letters, or even a punctuation or space. Adobe's SlimLM models are no different. Recent studies demonstrate that the LLMs created by the leading AI developers are capable of regurgitating substantial portions of the training data for those models, even with the implementation of safeguards designed to prevent the regurgitation of training data. (Emphasis added.)

---

[5] TechRader, *Adobe faces class action lawsuit after allegedly misusing authors work in AI training*, https://www.techradar.com/pro/adobe-faces-class-action-lawsuit-after-allegedly-misusing-authors-work-in-ai-training (Dec. 19, 2025).

[6] No. 3:25-cv-10732-JSC (N.D. Cal. Mar. 16, 2026) (Doc. 30).

**E.    Materially False and Misleading Statements and Omissions in Adobe's SEC Filings**

85.    Defendants are also responsible for making or approving false statements in various Abode filings with the SEC, including misstatements and omissions in the Company's annual reports and annual proxy filings approved by the Director Defendants.

**i.    False and Misleading Annual Reports**

86.    On January 17, 2024, Adobe filed its annual report on Form 10-K with the SEC for the fiscal year ended December 1, 2023 (the "2023 Annual Report")[7].  The 2023 Annual Report was prepared and signed by all of the Director Defendants and Durn and made many (false) representations regarding products based on SlimLM:

> We are expanding the capabilities of Creative Cloud on the web with the launch of Adobe Firefly and Photoshop on the web.  We are also infusing AI into our creative apps as a co-pilot to help our customers and users work faster and smarter, with new models for images and vector graphics, and AI-powered video features natively integrated into our flagship products like Photoshop, Illustrator, and Premiere Pro.  We are building our own foundation models in areas where we have domain expertise and which we believe are most relevant to our customers. ***Developing our own foundation models enables us to design Firefly to be commercially safe and in line with our AI Ethics principles of accountability, responsibility and transparency***.

> \*\*\*\*\*

> With Adobe Firefly, we believe we compete well by offering generative AI capabilities that are natively integrated into our products and ***designed to be safe for commercial use***.

> \*\*\*\*\*

> The content that ***Adobe Firefly generates is designed to be commercially safe because the Adobe Firefly generative AI model is trained on licensed content***, such as Adobe Stock, and public domain content for which copyright has expired. (Emphasis added.)

87.    On January 13, 2025, Adobe filed its annual report on Form 10-K with the SEC for the fiscal year ended November 29, 2024 (the "2024 Annual Report)[8].  The 2024 Annual Report was prepared and signed by all of the Director Defendants and, Durn and repeated many of the same (false) representations regarding products based on SlimLM:

> We are building our own foundation models in areas where we have domain expertise and which we believe are most relevant to our customers, and partnering with third-party AI models and large language models to further expand the capabilities of our products.  We

---

[7]  https://www.adobe.com/cc-shared/assets/investor-relations/pdfs/adbe-2023-annual-report.pdf

[8]  https://www.adobe.com/cc-shared/assets/investor-relations/pdfs/adbe-10k-fy24-final.pdf

- 22 -

expanded Adobe Firefly with the launch of Adobe Firefly Services, which help organizations automate content production; Custom Models, which enable enterprises to train and customize models to support brand consistency amongst creative and marketing teams; Firefly Video Model (public beta), which enables generative text-to-video and image-to-video; and Firefly Image 3 Foundation Model, which allows for faster and higher-quality image generations. ***Developing our own foundation models enables us to design Firefly to be commercially safe and in line with our AI Ethics principles of accountability, responsibility and transparency***.

\*\*\*\*\*

For example, with Adobe Firefly, we believe we compete well by offering generative AI models ***designed to be safe for commercial use*** and AI capabilities that are natively integrated into our products, and with Adobe Express, we believe we compete well by making our creative technologies accessible to a wide audience and enabling easy-to-use, efficient content creation, collaboration and sharing for quick projects.

**\*\*\*\*\***

***Adobe Firefly-generated content is designed to be commercially safe.  The Firefly generative AI model is trained on data Adobe has the rights to use***.  Every asset created using Firefly includes Content Credentials, a digital "nutrition label", to indicate that generative AI was used, bringing more trust and transparency to digital content.  Emphasis added.)

88.     On January 15, 2026, Adobe filed its annual report on Form 10-K with the SEC for the fiscal year ended November 28, 2025 (the "2025 Annual Report)[9].  The 2025 Annual Report was prepared and signed by all of the Director Defendants and, Durn and again repeated many of the same (false) representations regarding products based on SlimLM:

We build our own creativity-focused, ***commercially safe*** Firefly foundation models for generation and editing across categories.

**\*\*\*\*\***

***As AI continues to change content creation, our customers, particularly creators and enterprises, increasingly require responsible, secure and human-centered AI solutions. In developing our Firefly foundation models, we responsibly harness our unique data assets and help our customers amplify the value of their first-party data. Adobe leverages a rich dataset sourced from licensed content and public domain assets to train our Firefly generative AI models that are commercially safe for our customers.***  This approach respects creator rights and builds trust among enterprise customers, enabling them to confidently use AI-generated outputs in production workflows.  We also work with our customers to help them manage, gain insights from and unlock the power of their first-party data and assets, and build customized models and solutions using such data and assets stored in our applications, systems, and through connections to other business applications.

89.     Statements that Adobe's AI products were "commercially safe… designed to be safe for commercial use… trained on licensed content… data Adobe has the rights to use" were knowingly false

---

[9]  https://www.adobe.com/cc-shared/assets/investor-relations/pdfs/adbe-10k-fy25-final.pdf

- 23 -

and misleading when made because the Adobe Firefly generative AI model was trained on the SlimLM dataset that's included pirated materials. Moreover, at the time these (false) statements were made in Adobe's SEC filings, Defendants knew that multiple other corporations had been sued for copyright infringement for placing copyrighted documents on their dataset AI platforms, and that Books3 was defunct due to copyright infringement.

### ii. False and Misleading Proxy Statements

90. On March 1, 2024, Adobe filed its an annual Proxy Statement on Schedule 14A with the SEC (the "2024 Proxy Statement")[10]. The 2024 Proxy Statement was authorized by each of the Director Defendants and was filed in connection with the 2024 stockholder meeting to elect all of the Director Defendants, among other things.

91. The Director Defendants in the 2024 Proxy Statement touted the "incredible innovations at an accelerated pace" they claimed Adobe was able to achieve in its AI strategy. Their statement included specific representations regarding the data used to train Adobe's AI services, evidencing the importance of Abode's AI development and the Director Defendants' knowledge thereof:

> Our rich data sets draw upon our investments across creativity, documents and customer experiences and enable us to train our AI models on high-quality assets which are designed to generate commercially viable, professional quality content.

> \*\*\*\*\*

> We trained our Adobe Firefly creative generative AI family of models only on licensed images from Adobe Stock, ***openly licensed content, and public domain content where the copyright has expired***. (Emphasis added.)

92. On February 28, 2025, Adobe filed its an annual Proxy Statement on report on Schedule 14A with the SEC (the "2025 Proxy Statement")[11]. The 2025 Proxy Statement was authorized by each of the Director Defendants and was filed in connection with the 2025 stockholder meeting to elect all of the Director Defendants, among other things.

93. The Director Defendants in the 2025 Proxy Statement largely repeated their representations that the dataset contained exclusively public domain materials: "***We chose to train the***

---

[10] https://www.adobe.com/cc-shared/assets/investor-relations/pdfs/adbe-2024-proxy.pdf

[11] https://www.adobe.com/cc-shared/assets/investor-relations/pdfs/adbe-2025-proxy.pdf

- 24 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*Adobe Firefly family of creative generative AI models on licensed and public domain content to offer customers a commercially safe solution that respects creator rights and doesn't infringe on third-party intellectual property rights*." (Emphasis added.)

94. These statements were materially false and misleading and were made at a time when all Defendants knew or should have known that other AI developers had been sued by copyright holders for using datasets that included unlicensed materials and that the datasets used by Adobe were not limited to "public domain content where the copyright has expired" and/or "doesn't infringe on third-party intellectual property rights." At best, the Director Defendants acted negligently in making representations regarding Adobe's practices given the copyright claims associated with the Books3 and the SlimPajama dataset.

95. On February 27, 2026, Adobe filed its an annual Proxy Statement on report on Schedule 14A with the SEC (the "2026 Proxy Statement")[12]. The 2026 Proxy Statement, again authorized by each of the Director Defendants, conspicuously omitted the representations made in the 2024 Proxy Statement and the 2025 Proxy Statement that the dataset used to train the Company's AI products "openly licensed… public domain content where the copyright has expired" and "doesn't infringe on third-party intellectual property rights."

96. The Director Defendants' effective retraction of their prior representations regarding dataset used to develop SlimLM is a tacit admission that that dataset was decidedly not free from copyrighted materials at the time of the 2024 and 2025 Proxy Statements

**F.     Share Repurchase Waste**

97. During the same time period that Adobe was developing SlimLM based on the Red Pajama dataset, the Board agreed to cause Adobe to repurchase its own common stock at prices that were artificially inflated by the materially false and misleading statements and omissions in Adobe's SEC filings. In March 2024, the Board—while aware of the true extent of the Company's copyright infringement on its AI platforms and datasets, and the false and misleading 2024 Proxy Statement and 2024 Annual Report—authorized a share repurchase program up to $25 billion through March 14, 2028.

---

[12] https://www.adobe.com/cc-shared/assets/investor-relations/pdfs/adbe-2026-proxy.pdf

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

By November 28, 2025, just prior to filing of the *Lyon* action, Adobe had repurchased approximately 7.2 million shares under this program: (i) 2.1 million shares purchased at an average price of $353.68 per share between August 30, 2025 to September 26, 2025; (ii) 2.3 million shares purchased at the average price of $345.96 per share between September 27, 2025 to October 24, 2025; and (iii) 2.8 million shares purchased at the average price of $332.31 per share between October 25, 2025 to November 28, 2025. All of these repurchases were made at times when the Defendants knew, but had failed to disclose, the Company's copyright infringement on its AI platforms and datasets. As a result, the Company paid artificially inflated prices to buy its own shares.

### G.     Adobe's Extensive and Excessive Stock Drop

98.     As the date after the initial filing of the copyright infringement actions against Adobe, Adobe's stock closed at $354.66 per share. As of the date after the second filing, Adobe's stock had dropped to a closing price of $264.67 per share, stock price reduction of over 25%, reflecting, among other things, the market's perception of Adobe's potential liability from the copyright cases.

99.     As a result of all of these federal law violations and AI copyright infringements, Narayen stepped down from his CEO position. As of the date this was announced, on March 12, 2026, Adobe's stock dropped down almost 8%, to $249.75. Narayen's unplanned departure was specifically attributed to his failure to develop and implement a viable AI strategy for Adobe.

### DAMAGES TO ADOBE

100.     Adobe is significantly damaged by Defendants' misconduct. Defendants' failure to take required steps to eliminate copyrighted material from the AI SlimLM dataset, Adobe will be subject to potentially massive liability from the copyright infringement class actions. This includes not only the potential costs to resolve the litigation, but also legal fees, loss of goodwill, reputational damage, and lost customers, among other things.

101.     Adobe was further damaged by Defendants' failure to cause Narayen to step down from executive role as a soon as Defendants were aware of Adobe's copyright violations. This requited action would have minimized potential damages to Adobe, and also eliminated Narayen compensation in the collective amount of roughly $150 million 2023-25.

102. Abode was also damaged by spending nearly $2.5 billion to repurchase roughly 7.2 million of its shares at market prices artificially inflated by the false and misleading statements and omissions in SEC filings approved by the Director Defendants, amounting to a massive waste of corporate assets.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103. Adobe is named as a nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

104. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' wrongful conduct.

105. Plaintiff is a current stockholder of Adobe and has continuously owned Adobe common stock at all times relevant herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

106. A pre-suit demand on the Board of Adobe is futile and, therefore, excused. At the time this action was commenced, the Board consisted of the eleven Director Defendants: Narayen, Calderoni, Amon, Banse, Boulden, Desmond, Neumann, Oberg, Pandey, Ricks, and Rosensweig. As set forth below, the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability for their wrong acts, such that demand on the Board to institute this action is excused as futile.

107. The Director Defendants, together and individually, violated and breached their fiduciary duties of loyalty and acted in bad faith. The Director Defendants knowingly approved and/or permitted the wrongs alleged herein and caused the Company to engage in copyright infringement misconduct, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

108.	The Director Defendants either knowingly or recklessly issued or caused the Company to engage in copyright infringement misconduct, and to issue the materially false and misleading statements alleged herein.  The Director Defendants knowingly approved and/or permitted a business model to train Adobe's AI products on a dataset that included copyrighted materials and knew of the falsity of the misleading statements in SEC filings at the time they were made.  The Director Defendants thus face a substantial likelihood of liability and are not disinterested.

109.	As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's operations and the material events giving rise to these claims.  Specifically, as Board members of Adobe, the Director Defendants knew, or should have known, the material facts surrounding the Company's copyright infringement misconduct.

110.	Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

111.	Defendant Narayan was the CEO of the Company at relevant times and is not disinterested or independent.  Narayan has "[c]hampioned … innovation to establish Adobe as an AI leader in creativity, marketing and digital experience," which submits him substantially to the allegations of wrongdoing arising from many of the same events based on the same facts as alleged in this action, and the copyright infringement actions.[13]

112.	The Audit Committee Defendants (Desmond, Neumann, Pandey, and Oberg) are not disinterested or independent, and therefore, are incapable of considering a demand because, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to the adequacy and effectiveness of technology security policies, internal controls regarding information and technology security, cybersecurity, and privacy related areas, compliance with related legal, regulatory and ethical requirements, and public disclosure requirements.  The Audit Committee Defendants breached their fiduciary duties to the Company by

---

[13] https://www.adobe.com/cc-shared/assets/investor-relations/pdfs/adbe-2025-proxy.pdf.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

permitting and facilitating Adobe to conduct copyright violations and failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's copyright infringement misconduct and the adequacy of the Company's internal controls as alleged above. The Audit Committee Defendants therefore cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

113. The Director Defendants, as members of the Board, were and are subject to the Company's Code Business Conduct. The Code of Business Conduct go well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Defendants to also adhere to Adobe's standards of business conduct. The Director Defendants violated the Code of Ethics and Code of Business Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to engage in copyright infringement misconduct and make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Ethics and Code of Business Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

114. The Director Defendants' conduct was not the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As all of the directors face a substantial likelihood of liability, they are self-interested in the conduct challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as being futile.

115. The acts complained of herein constitute violations of fiduciary duties owed by Adobe's officers and directors, and these acts are incapable of ratification.

116. The Director Defendants may also be protected against personal liability for their wrongful acts by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds—*i.e.*, monies belonging to Adobe. Any directors' and officers' liability insurance policy covering the Director Defendants will contain provisions that eliminate

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

coverage for any action brought directly by the Company against its officers and directors, generally known as the "insured-versus-insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain officers of Adobe, there would be no directors' and officers' insurance protection.  Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Defendants is futile and, therefore, excused.

117.    If there is no directors' and officers' liability insurance, then the directors will not cause Adobe to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event as well.

118.    Thus, there is no majority of disinterested directors among the Director Defendants and demand is excused as futile.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

120.    Defendants owed and owe Adobe fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe Adobe the highest obligation of loyalty and care.

121.    The Defendants and each of them, violated and breached their fiduciary duties.

122.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that the Company and its statements concerning AI dataset were false and misleading.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

123.    The Director Defendants breached their duty of loyalty by permitting the improper activity concerning the copyright infringement misconduct.  The Director Defendants knew or were reckless in not knowing that Adobe's AI dataset process engaged in copyright infringement misconduct.  Accordingly, these defendants breached their duty of loyalty to the Company.

124. As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Adobe has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

125. Plaintiff, on behalf of Adobe, has no adequate remedy at law.

## COUNT II

### Against the Director Defendants for Waste of Corporate Assets

126. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127. The wrongful conduct alleged regarding the copyright infringement misconduct and the false and misleading statements concerning AI dataset were continuous, and ongoing throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company

128. As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; (ii) causing the Company to repurchase approximately 7.2 million shares of its common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the copyright infringement class actions.

129. As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

130. Plaintiff, on behalf Adobe, has no adequate remedy at law.

## COUNT III

### Against the Director Defendants for Violations of
### Section 14(a) of the Exchange Act and SEC Rule 14a-9

131. Plaintiff incorporates by reference and re-alleges each allegation contained above as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Director Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

- 31 -

132.    SEC Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits solicitation through a proxy stamen or other communication "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the Proxy Statements. The Proxy Statements contained proposals to the Company's stockholders urging them to re-elect the Director Defendants as members of the Board but misstated or failed to disclose the material information alleged herein.

133.    By reasons of the conduct alleged herein, the Director Defendants are in violation of Section 14(a) and Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company is misleading or deceiving its stockholders by making misleading statements that are an essential link in stockholders heeding the Company's recommendations to re-elect the current Board members up for election, approve the proposed executive compensation, and renew the contract of the outside auditor.

134.    Plaintiff thereby seeks injunctive and equitable relief because the conduct of the Director Defendants is interfering with Plaintiff's voting rights and choices at the annual meetings.

135.    This action was timely commenced within three years of the date of the Proxy Statements and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

### COUNT IV

#### Against Defendants Narayen and Durn for Violations of
#### Section 10(b) of the Exchange Act and SEC Rule 10b-5

136.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

137. Narayen and Durn violated Section 10(b) of Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Adobe in connection with the Company's repurchases of its stock during the applicable times relevant hereto.

138. Narayen and Durn were the most senior executive officers of the Company, and were responsible for, and are liable for, all materially false or misleading statements made in the SEC filings as complained of herein.

139. Narayen and Durn acted with scienter in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to Narayen and Durn or were so obvious that they should have been aware of them. Narayen and Durn also had a duty to disclose new information that came to their attention and rendered their prior statements materially false or misleading.

140. Adobe has and will suffer damages in that it paid artificially inflated prices for Apple common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the Company's copyright infringements that were disclosed, though the full extent of such wrongdoing has not yet been revealed. Adobe would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the false or misleading statements.

141. By reason of such conduct, Narayen and Durn are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

142. This action was timely commenced within two years from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based and within five years of the violation.

- 33 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the Company and against all Individual Defendants as follows:

A.    Declaring and determining that Plaintiff may maintain this action on behalf of Adobe and that Plaintiff is an adequate representative of the Company;

B.    Declaring and determining that the Defendants breached their fiduciary duties to Adobe;

C.    Declaring and determining that the Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by reason of the acts and omissions alleged herein;

D.    Declaring and determining that Narayen and Durn violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by reason of the acts and omissions alleged herein;

E.    Determining and awarding to Adobe the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

F.    Directing Adobe and the Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Adobe and its stockholders from a repeat of the damaging events described herein, including, but not limited to, actions as may be necessary to ensure proper corporate governance policies to strengthen the internal audit and control functions and ensure the establishment of effective oversight of compliance with copyright laws and all other applicable laws, rules, and regulations.

G.    Awarding Adobe restitution from Defendants, disgorgement of any benefits wrongly obtained by Defendants;

H.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I.    Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

- 34 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Dated: April 24, 2026

**GRANT & EISENHOFER P.A.**

By: */s/ David Wissbroecker*
David Wissbroecker (SB #243867)
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel: 415-229-9720
dwissbroecker@gelaw.com

James S. Notis
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: 212-722-8516
jnotis@gelaw.com

*Counsel for Plaintiff*

- 35 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT